*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0290p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

MICHAEL BEUKE,

    *Petitioner-Appellant,*

    *v.*

MARC C. HOUK, Warden,

    *Respondent-Appellee.*

No. 96-3050

>

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 92-00507—James L. Graham, District Judge.

Argued: March 14, 2007

Decided and Filed: August 13, 2008

Before: MARTIN, NORRIS, and BATCHELDER, Circuit Judges.

---

## COUNSEL

**ARGUED:** Ken F. Murray, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Phoenix, Arizona, for Appellant. Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Ken F. Murray, Megan B. Moriarty, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Phoenix, Arizona, for Appellant. Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

    BATCHELDER, J., delivered the opinion of the court, in which NORRIS, J., joined. MARTIN, J. (pp. 26-29), delivered a separate dissenting opinion.

---

## OPINION

---

    ALICE M. BATCHELDER, Circuit Judge. Petitioner-Appellant Michael Beuke ("Beuke") appeals the district court's dismissal of his petition for writ of habeas corpus. On appeal, Beuke raises thirteen issues for our review. Because Beuke filed his habeas petition prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), we apply pre-AEDPA standards of review. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). After careful consideration, we find Beuke's arguments to be without merit and therefore **AFFIRM** the judgment of the district court.

1

# I.

On May 14, 1983, Gregory Wahoff offered a ride to Michael Beuke who was walking along the side of the road. Once inside Wahoff's car, Beuke produced a .38 caliber revolver and demanded that Wahoff drive to a rural area in Hamilton County, Ohio. When they reached a sufficiently secluded area, Beuke led Wahoff into the woods; Wahoff eventually charged towards Beuke, attempting to wrestle the gun away from him. After this effort was unsuccessful, Wahoff began to run away, but Beuke shot him in the back, lodging a bullet in his spine and paralyzing him. Beuke then placed the gun against Wahoff's face and fired a second shot, which passed through Wahoff's cheek and lodged in the ground. Wahoff was fully conscious at this point, but he pretended to be dead and apparently succeeded in fooling Beuke, who returned to the car and drove off. Later that day, the police found Wahoff and took him to the hospital for emergency treatment; Wahoff survived Beuke's brutal attack.

A few weeks later, on June 1, 1983, the police discovered Robert Craig's body in a ditch on the side of a rural road in Clermont County, Ohio. Craig worked as a deliveryman supplying fresh fish to local restaurants, and during these travels, he would often offer rides to hitchhikers in the area. Beuke allegedly told Michael J. Cahill, a man with whom Beuke worked, that he killed Craig after Craig picked him up along the side of the highway. An autopsy on Craig's body revealed that he was shot twice in the head and once in the chest, and the police found his abandoned car in the parking lot of a local shopping mall.

Two days later, on June 3, 1983, Bruce Graham saw Beuke walking down the highway with a red gas can in hand. In an effort to help the apparently stranded traveler, Graham offered Beuke a ride to the nearest gas station. As he had done with Wahoff, Beuke brandished a short-barreled revolver and instructed Graham to drive to a rural area. When they arrived at the secluded destination, Beuke immediately fired at Graham. The bullet grazed Graham's forehead, inflicting a minor but bloody wound. After an unsuccessful effort to wrestle the gun from Beuke, Graham sought refuge in a nearby farmhouse. As Graham fled, Beuke fired several shots, one of which struck Graham in the shoulder. After Beuke realized that Graham had escaped to safety, he got into the car and left the scene of the shooting.

Sometime thereafter, Beuke's co-worker, Cahill, told the police what he knew of Beuke's involvement in the "mad hitchhiker" shootings. The police obtained a warrant and searched the car that Beuke had been driving, which he had borrowed from Cahill. The police discovered a cup that had been removed from Wahoff's car, a red gas can, and a blood-stained football jersey. The officers arrested Beuke who, at the time of his arrest, was in possession of a .38 caliber revolver — the same type of weapon he used to shoot Wahoff in the back.

In July 1983, an Ohio grand jury returned a ten-count indictment against Beuke, charging him with one count of aggravated murder, two counts of attempted aggravated murder, three counts of aggravated robbery, three counts of kidnaping, and one count of carrying a concealed weapon. The aggravated murder charge included two specifications, either of which, if proven beyond a reasonable doubt, would make Beuke eligible for the death penalty under Ohio law: (1) committing aggravated murder as part of a course of conduct involving the purposeful attempt to kill two or more persons, and (2) committing aggravated murder in the course of an aggravated robbery.

Beuke's jury trial began on September 19, 1983. The prosecution introduced extensive evidence implicating Beuke in the "mad hitchhiker" shootings, including Wahoff's and Graham's testimony of their nearly fatal encounters with Beuke, evidence linking the bullets extracted from Wahoff and Craig to Beuke's gun, Beuke's fingerprints on Wahoff's and Craig's automobiles, and Cahill's testimony about Beuke's confession. On October 5, 1983, the jury returned a guilty verdict on all ten counts and the two specifications, making Beuke eligible for capital punishment. Beuke's

counsel moved for a continuance of the penalty hearing, but the trial court granted only a short, one-day continuance and set the hearing for October 7, 1983. At the penalty hearing, Beuke introduced a presentence report and mitigation testimony from his parents. Unpersuaded by the defense's evidence, the jury found beyond a reasonable doubt that the aggravating factors outweighed the mitigating evidence and recommended that Beuke be sentenced to death. The trial court adopted the jury's recommendation and imposed the death penalty.

Beuke appealed his conviction and sentence to the Ohio First District Court of Appeals,[1] alleging twenty-six assignments of error. The appellate court denied Beuke's appeal in March 1986. *See State v. Bueke*, No. C-830829, 1986 WL 3750 (Ohio Ct. App. Mar. 26, 1986).[2] Beuke then appealed to the Supreme Court of Ohio; that appeal was denied in 1988. *See State v. Beuke*, 526 N.E.2d 274 (Ohio 1988). Beuke next sought a writ of certiorari from the United States Supreme Court, which was denied in 1989. *See Beuke v. Ohio*, 489 U.S. 1071 (1989).

In November 1989, having completed his direct appeal, Beuke filed a petition for post-conviction relief in state court, asserting eighty-five errors and requesting an evidentiary hearing. Some of the newly raised claims not asserted on direct appeal included ineffective assistance of trial counsel, ineffective assistance of appellate counsel, and a *Brady* claim for the withholding of exculpatory evidence. The trial court summarily denied Beuke's petition without an evidentiary hearing. In August 1991, the state appellate court affirmed the trial court's dismissal, *see State v. Beuke*, No. C-900718, 1991 WL 155219 (Ohio Ct. App. Aug. 14, 1991), and the Ohio Supreme Court denied discretionary review, *see State v. Beuke*, 583 N.E.2d 968 (Ohio 1992).

On June 18, 1992, Beuke filed a petition for a writ of habeas corpus with the district court, asserting ninety-two grounds for relief. The state filed a motion to dismiss, contending that Beuke had not exhausted his ineffective assistance of appellate counsel claim because he did not raise that claim in a motion for delayed reconsideration, as was required under the Ohio Supreme Court's decision in *State v. Murnahan*, 584 N.E.2d 1204, 1209 (Ohio 1992). On June 30, 1992, perhaps realizing that he had yet to exhaust his state remedies, Beuke filed a motion for delayed consideration with the Ohio First District Court of Appeals, alleging that he was denied effective assistance of appellate counsel. In September 1992, the district court granted the warden's motion and dismissed Beuke's habeas petition without prejudice for failure to exhaust state remedies.

In December 1992, the Ohio First District Court of Appeals denied Beuke's motion for delayed consideration because he failed to demonstrate good cause to justify his untimely filing as required by Ohio's procedural rules. The Ohio Supreme Court affirmed that decision. *See State v. Beuke*, 622 N.E.2d 649 (Ohio 1993). In November 1993, Beuke filed with the Ohio Supreme Court a motion for delayed reinstatement of his direct appeal, alleging that he was denied the effective assistance of appellate counsel on direct review. The Ohio Supreme Court denied that motion in March 1994.

In May 1994, Beuke filed a new habeas petition with the district court, which, after it was amended, included eighty-eight grounds for relief. More than a year after he instituted these habeas proceedings, Beuke filed two motions to expand the record, and a petition for leave to conduct discovery. The district court denied all of these motions on October 18, 1995. The very next day — October 19, 1995 — the district court denied Beuke's habeas petition, concluding that he had

---

[1] In 1995, some ten years after Beuke's conviction and appeal, the Ohio legislature amended Ohio's capital punishment scheme to provide for appeal of capital convictions and sentences from the trial court directly to the Ohio Supreme Court, *see* Ohio Rev. Code § 2929.05(A), which remains the present practice. Beuke's first appeal, however, was properly directed to, and heard by, the Ohio First District Court of Appeals, pursuant to the law at that time.

[2] The Ohio appellate court misspelled Beuke's name in the heading of its decision.

procedurally defaulted fifty-eight of his eighty-eight claims, and rejecting the remainder of his claims as lacking substantive merit. Beuke obtained a certificate of probable cause from the district court, and filed a timely notice of appeal to this court. We granted Beuke's motion to hold this case in abeyance pending the completion of (1) his second attempt at state post-conviction relief and (2) his civil suit seeking documents from the Federal Bureau of Investigation ("FBI") under the Freedom of Information Act ("FOIA").

In August 1996, Beuke filed a second petition for post-conviction relief with the state trial court, alleging that newly discovered evidence he had obtained from the FBI showed that the prosecutor had withheld exculpatory evidence in violation of *Brady*. The trial court rejected Beuke's second petition for post-conviction relief, finding that he had not satisfied the statutory requirements to proceed with a second petition. The appellate court affirmed this denial, *see State v. Beuke*, 720 N.E.2d 962 (Ohio Ct. App. 1998); the Ohio Supreme Court denied discretionary review, *see State v. Beuke*, 708 N.E.2d 209 (Ohio 1999); and the United States Supreme Court declined to review the case, *see Beuke v. Ohio*, 528 U.S. 934 (1999). While Beuke was pursuing his second attempt at post-conviction relief, he simultaneously appealed to the United States District Court for the District of Columbia the FBI's denial of the bulk of his FOIA request. The D.C. District Court denied Beuke's appeal by granting summary judgment to the FBI, and the D.C. Circuit affirmed in May 1998.

In October 1999, Beuke informed this court that he had concluded his collateral litigation, and filed a motion to remand proceedings to the district court so that he could introduce newly acquired evidence and add recently exhausted claims. We denied Beuke's motion to remand in July 2002. Beuke then filed a motion to expand the record to submit documents obtained during his second petition for post-conviction relief and FOIA litigation. We denied this motion to expand the record in April 2006, and the parties thereafter submitted briefs and presented oral arguments on the issues before this court.

## II.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), became effective on April 24, 1996. *Lindh*, 521 U.S. at 322. The provisions of AEDPA "generally apply only to cases filed after the [AEDPA] became effective." *Id.* at 336. Because Beuke filed his habeas petition in May 1994, prior to AEDPA's effective date, we will apply pre-AEDPA standards of review. *See Mapes v. Coyle*, 171 F.3d 408, 413 (6th Cir. 1999).

Under the pre-AEDPA standards, we review *de novo* the district court's disposition of a habeas petition. *Rickman v. Bell*, 131 F.3d 1150, 1153 (6th Cir. 1997). "Determinations of law, or determinations involving mixed questions of fact and law . . . receive *de novo* review." *Mapes*, 171 F.3d at 413. Historical facts as found by the state court "are presumed correct and are rebuttable only by clear and convincing evidence." *Id.*

Beuke raises thirteen issues for our review on appeal; two of these issues are closely related constitutional challenges to Ohio's death penalty scheme, and we will address them as a single claim. We accordingly have separated our analysis into twelve sections.

## A.      Procedural Default of Beuke's Claim for Ineffective Assistance of Appellate Counsel

Beuke first argues that the district court erroneously concluded that he procedurally defaulted fifty-eight of his eighty-eight habeas claims. Federal courts must consider four factors when assessing whether a habeas petitioner has procedurally defaulted his claims. *Gonzales v. Elo*, 233 F.3d 348, 353 (6th Cir. 2000); *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). Our analysis begins with the first three factors of the procedural default inquiry:

>First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. Second, the court must decide whether the state courts actually enforced the state procedural sanction. Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.

*Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001) (quoting *Maupin*, 785 F.2d at 138) (alterations omitted). "Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground," the court must move to the fourth factor. *Maupin*, 785 F.2d at 138. The fourth factor allows a petitioner to avoid or excuse procedural default if he demonstrates "that there was cause for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error." *Id.* (quotation omitted).

The district court found that Beuke had procedurally defaulted fifty-eight of his eighty-eight claims. Effectively conceding that the first three factors of procedural default are satisfied, Beuke focuses his argument on the fourth factor, contending that his ineffective assistance of appellate counsel claim establishes the "cause" and "prejudice" to save all of his fifty-eight defaulted claims. We have previously acknowledged that an ineffective-assistance claim "can serve as both cause and prejudice, excusing a procedural default in an underlying substantive claim[.]" *Franklin v. Anderson*, 434 F.3d 412, 418 (6th Cir. 2006). But the ineffective-assistance claim "can serve as cause to excuse the procedural default of another habeas claim *only* if the habeas petitioner can satisfy the 'cause and prejudice' standard with respect to the ineffective-assistance claim itself," that is, only if the ineffective-assistance claim was not itself procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 450-51 (2000) (emphasis added); *see also Franklin*, 434 F.3d at 418. Accordingly, we must consider whether Beuke procedurally defaulted his ineffective-assistance claim.

The district court found that Beuke's ineffective-assistance claim was procedurally defaulted because the Ohio appellate court found that claim to be "waived and barred from further review by [Beuke's] failure to move for reconsideration in the Court of Appeals following the denial of his direct appeal." In 1989, Beuke completed his direct appeal and instituted his first petition for post-conviction relief, in which he — for the first time — asserted his ineffective-assistance claim. At that time, however, the clearly established precedent in the Ohio First District Court of Appeals mandated that "a claim of ineffective assistance of counsel . . . may not be entertained by a trial judge when considering a petition for postconviction relief," but that the petitioner instead should present this claim directly to the state appellate court in a motion for reconsideration. *State v. Rone*, No. C-820640, 1983 WL 5172, at *4 (Ohio Ct. App. Aug. 31, 1983); *see also Hicks v. Collins*, 384 F.3d 204, 212 (6th Cir. 2004) ("[T]he rule was well settled in the court of appeals where [the petitioner] appealed [i.e., the Ohio First District Court of Appeals] that ineffective appellate counsel claims should be asserted in reconsideration applications"). Over two years later, in February 1992, the Ohio Supreme Court issued its decision in *State v. Murnahan*, 584 N.E.2d 1204, 1208-09 (Ohio 1992), which pronounced for the entire state that "claims of ineffective assistance of appellate counsel are not cognizable in post-conviction proceedings," noting instead that such claims should be raised "in an application for reconsideration in the court of appeals." *Id.* at 1208. Four months after the *Murnahan* decision, and nearly three years after the conclusion of his direct appeal, Beuke filed a motion for reconsideration with the Ohio First District Court of Appeals. Not surprisingly, the court denied the motion, holding that Beuke did not establish good cause for his untimely filing because the law had been well settled in the Ohio First District Court of Appeals that claims of ineffective assistance of appellate counsel must be brought in a motion for reconsideration.

Beuke contends that he cannot be held to have procedurally defaulted this claim because when he filed his motion, the Ohio courts did not have a firmly established and regularly followed

procedural rule governing motions for reconsideration. But Beuke's argument ignores the fact that, dating back to 1983, it had been clear to litigants in the Ohio First District Court of Appeals that a criminal defendant must present his ineffective assistance of appellate counsel claim in a motion for reconsideration, not in a petition for post-conviction relief. Turning to our circuit's precedent, Beuke argues that his situation is controlled by *Franklin v. Anderson*, 434 F.3d 412 (6th Cir. 2006). We, however, are convinced that this case is controlled by *Hicks v. Collins*, 384 F.3d 204 (6th Cir. 2004). In *Franklin*, we held that "at the time [the petitioner] filed his Motion for Delayed Reconsideration . . . , the Ohio courts did not have a 'firmly established and regularly followed' procedural rule governing the timeliness of such motions." *Franklin*, 434 F.3d at 418. We viewed the Ohio Supreme Court's decision in *Murnahan* as creating ambiguities on the timeliness of motions for reconsideration, *id.* at 418-19, and because Franklin completed his direct appeal soon after *Murnahan* — while the Ohio courts were in a period of limbo on this issue — we held that Franklin could not be faulted for filing his motion to reconsider in an untimely manner.

The *Franklin* decision specifically distinguished *Hicks* as a case that "applies to a time before *Murnahan*." *Id.* at 420. Unlike the petitioner in *Franklin*, the petitioner in *Hicks* completed his direct appeal and instituted his post-conviction relief proceedings prior to the Ohio Supreme Court's decision in *Murnahan*. *Hicks*, 384 F.3d at 212. Hicks improperly included his ineffective-assistance claim in his petition for post-conviction relief, and the state trial court dismissed Hick's petition because the Ohio First District Court of Appeals, the district in which Hicks's direct appeal was heard, clearly required an ineffective-assistance claim to be brought in a motion for reconsideration. The Ohio Supreme Court then decided *Murnahan*, and Hicks waited another seven months after that decision before filing his motion for reconsideration. The *Hicks* court held that the procedural rule requiring ineffective-assistance claims to be asserted in a timely filed motion for reconsideration "was well settled in the court of appeals where Hicks appealed [i.e. the Ohio First District Court of Appeals]" and therefore "represent[ed] an established adequate and independent state ground" upon which to deny Hicks's claim. *Id.*

The procedural history in Beuke's case is nearly identical to that of *Hicks*. Here, as in *Hicks*, (1) the petitioner improperly asserted his ineffective-assistance claim in his petition for post-conviction relief in the Ohio First District Court of Appeals; (2) the Ohio Supreme Court issued *Murnahan* after the trial court dismissed the petitioner's request for post-conviction relief; and (3) the petitioner waited several months following *Murnahan* to file his motion for reconsideration. Therefore we find that this case is controlled by *Hicks*, and we conclude, based on that precedent, that Beuke procedurally defaulted his ineffective-assistance claim.

In summary, the clearly established rule in the Ohio First District Court of Appeals — adopted long before Beuke concluded his direct appeal — demanded that Beuke present his ineffective-assistance claim in a motion for reconsideration. Beuke initially violated this rule by including his ineffective-assistance claim in his first petition for post-conviction relief. Recognizing his blunder, Beuke filed a motion for reconsideration more than three years after the conclusion of his direct appeal, long after the deadline for filing such a motion had passed. *See* Ohio App. R. 26. This firmly established and regularly followed procedural rule constitutes an adequate and independent state ground upon which to foreclose judicial review, and Beuke has not established cause and prejudice for his untimely compliance. Accordingly, Beuke, like the petitioner in *Hicks*, has procedurally defaulted his ineffective assistance of appellate counsel claim and, in turn, cannot use that claim as cause and prejudice to excuse his other defaulted claims. *See Edwards*, 529 U.S. at 450-51; *Franklin*, 434 F.3d at 418. We thus affirm the district court's conclusion that Beuke procedurally defaulted fifty-eight of the eighty-eight claims in his habeas petition.

**B.        Procedural Default of Beuke's *Brady* Claim**

Beuke next asserts that the prosecution violated his due process rights by failing to provide him with exculpatory evidence as mandated by *Brady v. Maryland*, 373 U.S. 83 (1963). *Brady* requires the prosecution to disclose exculpatory and impeachment evidence that is "material either to guilt or to punishment." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *Brady*, 373 U.S. at 87). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A *Brady* violation includes three elements: (1) the evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) the "evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." *Strickler*, 527 U.S. at 281-82.

Beuke first raised his *Brady* claim in his petition for post-conviction relief, alleging that the prosecution failed to produce (1) a list of individuals suspected of involvement in the "mad hitchhiker" shootings and (2) evidence showing that the prosecution's witness, Michael Cahill, changed his story several times. The Ohio appellate court held that this claim was barred by the doctrine of *res judicata* because it could have been raised on direct appeal and was inappropriate in a post-conviction proceeding. *See Beuke*, 1991 WL 155219, at *2. Beuke again asserted a *Brady* claim in his habeas petition, identifying numerous pieces of favorable evidence that the government did not disclose prior to trial, including the list of other suspects and inconsistent statements by Michael Cahill. After filing his petition, Beuke claimed that he had discovered more suppressed evidence, so he filed two motions to expand the record and a motion for leave to conduct further discovery. In these motions, Beuke sought to compel the production of, among other things, all Michael Cahill's recorded statements. The district court denied Beuke's request to expand the record or compel discovery because Beuke should have made this evidence part of the record in state court and, in any event, none of the proffered evidence involved a fact that was material to his conviction. Despite denying Beuke's motions, the district court admitted four documents that Beuke proffered to the court: (1) a transcript of David Pierce's interview with the police (which allegedly contradicted Cahill's testimony), (2) a transcript of Rick Polly's interview with the police (which allegedly contradicted Cahill's testimony), (3) a written summary of an interview between FBI agents and Michael Cahill, and (4) documents showing Robert Craig's criminal history. In a subsequent order, the district court held that Beuke procedurally defaulted his *Brady* claim because he failed to raise it on direct appeal.

On appeal, Beuke argues that the prosecution's failure to disclose this favorable evidence constitutes the cause and prejudice to excuse the procedural default of his *Brady* claim. A habeas petitioner can show cause where he failed to raise a constitutional issue because it was "reasonably unknown to him" at the time. *Amadeo v. Zant*, 486 U.S. 214, 222 (1988). Because the State does not directly dispute "cause," we will assume, without deciding, that the prosecution's withholding of exculpatory or impeachment evidence caused Beuke to default his *Brady* claim. *See Strickler*, 527 U.S. at 289 (finding that the government's withholding of exculpatory evidence, combined with two other factors not present here, were sufficient to constitute cause). Our analysis, therefore, turns on the issue of prejudice. "Prejudice, for purposes of procedural default analysis, requires a showing that the default of the claim not merely created a possibility of prejudice to the defendant, but that it worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." *Jamison v. Collins*, 291 F.3d 380, 388 (6th Cir. 2002) (citing *United States v. Frady*, 456 U.S. 152, 170-71 (1982)). Procedural default analysis on the issue of prejudice mirrors *Brady* materiality analysis, *see id.*, so in determining whether Beuke has procedurally defaulted his *Brady* claim, we will follow the Supreme Court's example and proceed under a *Brady* materiality analysis. *See Strickler*, 527 U.S. at 282.

When engaging in *Brady* materiality analysis, we find that "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. "A 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678). In reviewing for materiality, we consider the cumulative effect of the undisclosed evidence, not each item in isolation. *Id.* at 436.

On appeal, Beuke presents nine pieces of evidence that he alleges the prosecution failed to disclose in violation of *Brady*: (1) inconsistent statements that Cahill made to the Hamilton County Sheriff's Department and to the grand jury;[3] (2) inconsistent statements that Cahill made to the FBI; (3) FBI documents indicating that one of the prosecution's witnesses (who Beuke believes to be Cahill) was a paid informant; (4) FBI documents showing that Cahill was under investigation for child pornography offenses; (5) Rick Polly's statements that contradicted Cahill's testimony; (6) Wahoff's and Graham's initial description of their assailants, neither of which matched Beuke's physical appearance; (7) a list of other criminal suspects investigated by the police; (8) an investigating officer's handwritten notes suggesting that Wahoff was shot by a gun different from that used to shoot Craig and Graham; and (9) records disclosing Craig's criminal history.[4] Beuke contends that the first five pieces of undisclosed evidence could have impeached the credibility of Michael Cahill, that Wahoff's and Graham's initial description of their assailants could have impeached their in-court identifications of Beuke, and that Craig's criminal history could have contradicted the angelic picture the prosecution painted of the victim. But Beuke does not indicate how the prosecution's failure to disclose the list of other criminal suspects or the investigating officer's handwritten notes caused him prejudice at trial.

We begin with the heart of Beuke's *Brady* claim, which is the undisclosed evidence that would have been useful for impeaching Michael Cahill. Cahill testified that Beuke told him the story of how he killed Robert Craig, and Cahill relayed the details of this story to the jury. Beuke contends that Cahill's inconsistent statements could have been used to impeach his testimony, but he does not highlight any inconsistencies between Cahill's prior statements and his testimony at trial. Importantly, Beuke does not allege that Cahill presented inconsistent testimony on an

---

[3] Beuke admits that prior to trial the prosecution provided him with Cahill's statements to the Hamilton County Sheriff's Department and the grand jury, but nevertheless contends a *Brady* violation because he was given insufficient time to review these materials. "*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose." *United States v. Bencs*, 28 F.3d 555, 560-61 (6th Cir. 1994). "Delay only violates *Brady* when the delay itself causes prejudice." *Id.* at 561. Because we address prejudice in the body of the opinion, we need not address this claim separately.

[4] Beuke alleges that he obtained many of these documents during his FOIA suit against the FBI, but he fails to provide this court with most of these undisclosed documents. The only alleged *Brady* documents included in the joint appendix are the transcript of Cahill's interview with the Hamilton County Sheriff's Office, the summary of Cahill's statement to the FBI, Rick Polly's statement contradicting Cahill's testimony, and Craig's arrest record. Beuke says that many of the other documents are contained in the record of his FOIA suit against the FBI or in his second petition for post-conviction relief, but because they are not provided in the joint appendix before this court, we are unable to review them. Moreover, the *Brady* claim, as presented in Beuke's habeas petition, does not include all nine pieces of evidence he now presents as part of that claim. For example, his habeas petition did not allege that the prosecution withheld (1) the FBI document showing that one of the informants had been paid, (2) the FBI document showing that Michael Cahill was under investigation for child pornography offenses, (3) Wahoff's and Graham's initial descriptions of their assailant, or (4) the investigating officer's handwritten notes. In his brief, Beuke argues that the district court erred in considering only a portion of the allegedly suppressed evidence, rather than the cumulative effect of all the items referenced in his brief. *See Castleberry v. Brigano*, 349 F.3d 286, 291-92 (6th Cir. 2003) (finding that the state appellate court's "item-by-item determination of materiality" was contrary to Supreme Court precedent). We reject this argument because, by failing to notify the district court of all this withheld evidence, Beuke deprived the court of the opportunity to consider its cumulative effect.

important issue of guilt, such as Beuke's confession to killing Craig, but merely that Cahill's inconsistencies on tangential issues — as well as other evidence such as the FBI's investigation of Cahill for child pornography — undermine his overall credibility. We doubt that this evidence would do much to undermine Cahill's testimony relating Beuke's confession. But even if we were to assume that this undisclosed evidence would have tarnished Cahill's credibility beyond repair, it does not negate or even diminish the substantial objective evidence of Beuke's guilt.

Beuke emphasizes the importance of Cahill's testimony by asserting that the prosecution's proof of Craig's murder was dependent upon the credibility of Cahill's testimony. The record discloses a different story, however, because it is clear that the prosecution presented other concrete evidence, in addition to Cahill's testimony, linking Beuke to Craig's murder. This objective evidence includes the officers' discovery of Beuke's fingerprints in Craig's car and forensic evidence indicating that the bullets removed from Craig's body were fired from Beuke's gun. Thus, contrary to Beuke's assertions, Cahill's testimony was not the central piece of evidence holding together an otherwise feeble case, but was merely one piece of a cumulative evidentiary puzzle. We find that because the objective evidence sufficiently linked Beuke to Craig's murder, the suppressed evidence undermining Cahill's credibility does not tend to undermine our confidence in the jury's verdict. *See Strickler*, 527 U.S. at 293-94 (refusing to find prejudice where the record contained "considerable forensic and other physical evidence linking petitioner to the crime," because this objective evidence indicated that the "petitioner would have been convicted . . . , even if [the witness] had been severely impeached" by the undisclosed evidence). *Cf. Jamison*, 291 F.3d at 391 (finding prejudice where, unlike here, the undisclosed evidence would have impeached vital prosecution testimony, leaving only one piece of highly suspect physical evidence upon which to base the conviction); *Kyles*, 514 U.S. at 441 (finding *Brady* materiality satisfied where, unlike here, "'the essence of the State's case' was the testimony of eyewitnesses").

The other undisclosed evidence does not bolster Beuke's claim of materiality under *Brady*. Beuke does not provide this court with Wahoff's and Graham's initial descriptions of their assailants, and we cannot determine how far afield their descriptions may have been. In any event, we are hard-pressed to believe that an inaccurate sketch or physical description would undermine an in-court identification by victims who had lengthy exposures to their assailant, during which each of them endured a prolonged car ride with a gun pointed directly at him. Moreover, Beuke does not establish, and we do not see, how the outcome of his trial was prejudiced by the prosecution's failure to disclose a list of other criminal suspects, Craig's criminal record, or the investigating officer's handwritten notes. Considering as we must the cumulative effect of all nine pieces of undisclosed evidence, we find that Beuke has failed to establish a "reasonable probability" that the disclosure of this evidence would have altered the result of this proceeding. *See Bagley*, 473 U.S. at 682. Because this evidence is not material under *Brady*, Beuke cannot show prejudice to excuse procedural default. *See Jamison*, 291 F.3d at 388. And because Beuke cannot establish prejudice to excuse his procedurally defaulted *Brady* claim, we affirm the district court's dismissal of that claim.

## C.     Right to an Impartial Jury — Limitation of Questioning at *Voir Dire*

Beuke asserts that the state trial court violated his right to an impartial jury by preventing him from asking prospective jurors why they wished to serve on the jury. The trial court prohibited this line of questioning because it unnecessarily "put[] the juror on the spot," and subjected him or her to a potentially embarrassing exchange. Beuke raised this claim on direct appeal, and the Ohio Supreme Court found that the trial court's ruling was "well within its discretion and that the defense otherwise exercised great latitude in examining the jurors for enmity or bias." *Beuke*, 526 N.E.2d at 286. The district court similarly found that "[t]rial judges have broad discretion in determining whether questions may be asked during *voir dire*" and that the trial court did not commit "constitutional error in restricting these questions."

The Supreme Court has consistently "stressed the wide discretion granted to the trial court in conducting *voir dire* . . . in . . . areas of inquiry that might tend to show juror bias." *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991); *see also Ham v. South Carolina*, 409 U.S. 524, 528 (1973) (noting the "traditionally broad discretion accorded to the trial judge in conducting voir dire"). In the context of *voir dire*, the trial court violates the defendant's constitutional rights only when it restricts a "constitutionally compelled" question. *See Mu'Min*, 500 U.S. at 424-25. A proffered *voir dire* question is not constitutionally required simply because it "might be helpful in assessing whether a juror is impartial"; instead a question is constitutionally compelled only where the "failure to ask [that] question[] . . . render[s] the defendant's trial fundamentally unfair." *Id.* at 425-26. Beuke contends that the trial court violated his constitutional rights because his questions probing the jurors' desires to serve on the jury would have exposed their potential biases. Even though this line of questioning might have helped to expose juror bias, its omission does not result in a fundamentally unfair trial, and therefore it is not constitutionally compelled. *See id.* Accordingly, we find that the trial court did not commit constitutional error by restricting defense counsel's questioning at *voir dire*.

**D.      Right to an Impartial Jury — Refusal to Dismiss Prospective Jurors for Cause**

Beuke argues that the state trial court violated his right to an impartial jury by denying his request to strike four prospective jurors for cause. Beuke requested that the court remove the first of these prospective jurors, the wife of one police officer and the mother of another, because her *voir dire* testimony indicated that she believed a criminal defendant probably did "something" in order to be charged with a crime and that she had a tendency to side with the prosecution and law enforcement over a defendant. When pressed further, however, this woman stated that she could be an impartial juror and acknowledged that she would follow the court's instructions and put aside her tendencies to agree with law enforcement rather than with a suspected criminal. Beuke requested the removal of the second candidate because she stated that if Beuke was convicted, she "would vote for capital punishment" in order to ensure that he would not get parole. But when questioned by the judge, she repeatedly indicated that she would be a fair and impartial juror who followed the court's instructions. Beuke requested that the third candidate be removed for cause because of her statement that she would disregard the court's instructions and vote for the death penalty based upon her belief that any person who intentionally takes the life of another forfeits his own right to live. Upon further questioning, however, she indicated that she would follow the court's instructions in recommending the defendant's sentence. Beuke asked the court to remove the fourth candidate because she expressed her belief that Beuke "must have done something" if the prosecutor was bringing these charges against him; but when questioned by the court, she too acknowledged that she would follow the court's instructions and apply the presumption of innocence. After the court refused to dismiss these four candidates for cause, the prosecution used one of its peremptory challenges to excuse the first, and Beuke used three of his twelve peremptory challenges to remove the other three.

Beuke contends that the trial court violated his right to an impartial jury because the court's denial of his request to remove these four prospective jurors for cause forced him to use valuable peremptory challenges to remove them. Even if we were to assume that the trial court should have dismissed these jurors for cause — a conclusion that is severely belied by the record and applicable case law, *see Miller v. Francis*, 269 F.3d 609, 618-19 (6th Cir. 2001) (holding that "the trial court cannot be faulted for not disqualifying for cause a juror who consistently says that she thinks she can be fair") — there is no legal basis for Beuke's impartial jury claim. "Any claim that the jury was not impartial . . . must focus . . . on the jurors who ultimately sat" on the jury, not on those dismissed through peremptory challenges. *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988). Beuke does not challenge the impartiality of any juror who actually sat on the empaneled jury, but only of four prospective jurors who were dismissed through peremptory challenges. Thus, Beuke's only alleged injury is the loss of his peremptory challenges, and it is well settled that the loss of a peremptory

challenge does not violate a defendant's constitutional right to an impartial jury because "peremptory challenges are not of constitutional dimension." *Id.* at 88 (citing *Gray v. Mississippi*, 481 U.S. 648, 663 (1987)); *accord United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000). We accordingly reject Beuke's challenge to the trial court's denial of his request to dismiss prospective jurors for cause because he "cured" this alleged error when he removed those jurors with his peremptory challenges. *See Ross*, 487 U.S. at 88; *Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003).

### E.       Right to an Impartial Jury — Dismissal of Prospective Jurors

Further pressing the impartial jury claim, Beuke next contends that he was denied this right when the trial court improperly excused six prospective jurors who expressed any opposition to the death penalty. "[A] juror who in no case would vote for capital punishment, regardless of his or her instructions, . . . must be removed for cause." *Morgan v. Illinois*, 504 U.S. 719, 728 (1992). "[T]he proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quotations omitted). "[T]his standard . . . does not require that a juror's bias be proved with 'unmistakable clarity'" because such an exacting standard does not comport with the realities of *voir dire* questioning. *Id.* at 424-25. A state court trial judge's conclusion that a prospective capital-sentencing juror should be excluded for cause because of his views on the death penalty is a finding of fact entitled to a presumption of correctness from this court on federal habeas review. *Id.* at 428-29.

Beuke asserts that the trial court improperly removed six prospective jurors. The first two indicated that they would not impose the death penalty under any circumstances because it conflicted with their religious beliefs. The third similarly stated that he could not impose the death penalty under any circumstances, and the fourth indicated that she did not "believe" she could impose the death penalty even if the facts and law warranted such punishment. Unlike the others, the fifth and sixth were slightly less adamant in their opposition to the death penalty. The fifth initially stated that she did not "think" she could impose the death penalty even if required by the law and facts. When pressed further, however, she indicated that she would "try" to follow the law and impose the death penalty if warranted by the law, but ultimately affirmed that she could not agree to a verdict recommending death. The sixth candidate's testimony was similarly inconsistent. Although at one point she stated that there may be a proper case where the death penalty would be warranted, she eventually attested to her unalterable opposition to a sentence of death.

After reviewing the *voir dire* testimony in the record, we find no constitutional error in the trial court's dismissal of these six prospective jurors. We find that each of the first four candidates stated unequivocally that he or she would not impose death under any circumstances, and the law requires that such jurors — with unshakable opposition to the death penalty — be removed for cause. *See Morgan*, 504 U.S. at 728. And although the fifth and sixth candidates both waffled and hedged when discussing their willingness and ability to impose the death penalty, ultimately both stated that they would be unable to join a verdict that imposed the death penalty even if mandated by law, and were therefore unfit for service on a jury charged with the burden of considering capital punishment. *See Witt*, 469 U.S. at 424. Especially in light of the deference afforded to the trial judge's conclusions on these issues, *see Bowling*, 344 F.3d at 519, we find no constitutional error in the trial court's dismissal of these prospective jurors.

### F.       Due Process — The Testimony of the Murder Victim's Wife at the Guilt Phase of Trial

Beuke next alleges that the testimony of Robert Craig's wife at the guilt phase of trial violated his due process rights. Mrs. Craig testified that her husband had picked up two hitchhikers

and provided them with a place to sleep just three weeks prior to his murder. She also stated that she and her husband had three children, one of whom was born shortly before trial and was given the name Robert, in memory of his father. Beuke objected to this testimony and moved for a mistrial; the court overruled the objection and denied the motion for a mistrial.[5]

On appeal, Beuke argues that Mrs. Craig's testimony violated his due process rights because it was irrelevant and highly inflammatory. We are severely limited in our ability to grant federal habeas relief because of a state court evidentiary ruling: we can grant relief only in the limited circumstances where the state court's decision was "so fundamentally unfair as to violate the petitioner's due process rights." *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). The categories of infractions that violate "fundamental fairness" have been defined "very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990). Beuke himself admits that the constitution "erects no *per se* bar" to "the admission of victim impact evidence," *see Payne v. Tennessee*, 501 U.S. 808, 827 (1991); *see also Hicks*, 384 F.3d at 222 (noting our approval of "victim impact evidence during the guilt phase . . . as an extension of *Payne*"), and he concedes that we can find a constitutional violation only if Mrs. Craig's testimony resulted in a "fundamentally unfair" trial, *see Payne*, 501 U.S. at 825; *Byrd v. Collins*, 209 F.3d 486, 532-33 (6th Cir. 2000). Beuke has provided no directly applicable legal authority, but only bald, conclusory allegations that Mrs. Craig's testimony was irrelevant and highly inflammatory. We find no merit in this argument.

Mrs. Craig's testimony may be divided into two categories: (1) testimony about her husband's history of picking up hitchhikers and (2) testimony about her children. Contrary to Beuke's assertions, Mrs. Craig's testimony about her husband's history of picking up hitchhikers is entirely relevant when considering — and indeed probative for establishing — whether he offered Beuke a ride on the day of his murder. We certainly find no error — let alone a constitutional error — in admitting this testimony. Mrs. Craig's testimony about her children, while perhaps not relevant to the issue of guilt, was minimal and largely insignificant. In less than one-half page of transcript testimony, Mrs. Craig told the jury that she had three children, provided their respective ages, and stated the name of her newborn child, Robert. Admission of these three brief statements about the victim's family was not constitutionally improper, *see Hicks*, 384 F.3d at 222 (approving the use of victim-impact evidence at the guilt phase of trial); *Byrd*, 209 F.3d at 532 (same), because it was not inflammatory and did not otherwise create a fundamentally unfair trial. We thus conclude that Mrs. Craig's brief testimony did not violate Beuke's due process rights.

---

[5] As part of this due process claim, Beuke also objects to the prosecutor's references to Mrs. Craig's testimony during his closing argument. Beuke argues that the prosecutor's use of this evidence during closing argument violated his due process rights at the guilt phase of trial; this argument is misplaced, however, because the closing argument to which Beuke refers occurred at the conclusion of the penalty phase. Therefore, when resolving this claim, which challenges the constitutionality of the guilt phase of Beuke's trial, we will ignore the prosecutor's references to Mrs. Craig's testimony, which occurred at the penalty phase. Later in the opinion, however, when evaluating Beuke's claim of prosecutorial misconduct at the penalty phase, we will consider the propriety of the prosecutor's references to victim-impact evidence, including the testimony of Mrs. Craig.

**G.       Denial of Beuke's Requests for a Continuance prior to the Penalty Phase**

Beuke argues that the trial court violated his constitutional rights by denying his motion for a continuance prior to the penalty phase.[6]   The jury returned its guilty verdict on Wednesday, October 5, 1983, at 9:23 p.m.   Just minutes later, the judge held a sidebar and asked Beuke's attorneys if they could be ready for a sentencing hearing by the following afternoon.   Defense counsel responded, "Come on . . . , [t]here is no way in the world."   The judge proceeded to set the sentencing hearing for the morning of Friday, October 7, 1983, and told defense counsel to request any necessary materials, such as a presentence investigation, by early the next morning.   In response, defense counsel opined that this quick turnaround was "a little ridiculous under the circumstances."   After the judge sequestered the jury, defense counsel reiterated their belief that the Friday morning sentencing hearing did not provide "adequate time to prepare."   The court, however, ordered all the attorneys to return the next morning so that defense counsel could make a formal request for a presentence investigation.

At the Thursday morning hearing, defense counsel stated that they were "not waiving [their] objection that . . . there ha[d] not been sufficient time to make adequate determinations or to prepare to come to th[e] [sentencing] hearing."   Defense counsel then presented a formal request for a presentence investigation and psychiatric evaluation, and indicated that Beuke's parents would be the only two mitigation witnesses called at sentencing.

At the beginning of the Friday morning sentencing hearing, defense counsel reiterated their objection to the quick turnaround between the guilt and penalty phases, noting that "there hasn't been sufficient time."   Defense counsel then objected to having only one hour to review the presentence investigation and psychiatric evaluation, whereupon the court provided a thirty-minute recess so counsel could further review those reports.

A trial court's denial of a continuance rises to the level of a constitutional violation only where there is "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay.'"   *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)); *United States v. Moreno*, 933 F.2d 362, 371 (6th Cir. 1991). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.   The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."   *Ungar*, 376 U.S. at 589.   To obtain habeas relief, it is not sufficient for the petitioner to show that the trial court arbitrarily denied the continuance request; he "must also show that the denial of a continuance actually prejudiced his . . . defense."   *Burton v. Renico*, 391 F.3d 764, 772 (6th Cir. 2004).   "Actual prejudice may be demonstrated by showing that additional time would have made relevant witnesses available or otherwise [would have benefitted] the defense."   *Powell v. Collins*, 332 F.3d 376, 396 (6th Cir. 2003).

We reject Beuke's claim that the trial court violated his constitutional rights by denying his request for a continuance.   Beuke has not demonstrated that he made a "justifiable request" for a continuance, *see Slappy*, 461 U.S. at 11-12; his counsel did not state any particular reason why the trial court should grant the continuance, asserting only that the court provided "insufficient" or "inadequate" time to prepare and that the judge's timetable was a "little ridiculous under the

---

[6] Even though Beuke alleges a "constitutional violation" resulting from the district court's denial of his request for a continuance, he does not indicate which constitutional provision is violated under these circumstances.   We will assume that he is alleging a violation of his Sixth Amendment right to counsel, *see Morris v. Slappy*, 461 U.S. 1, 11-12 (1983), although we have previously construed similar claims as alleging a due process violation, *see Powell v. Collins*, 332 F.3d 376, 396 (6th Cir. 2003).   Regardless of which provision we apply, we do not find a constitutional violation warranting habeas relief.

circumstances." Such generalized objections do not constitute a justifiable request for a continuance.[7] While it is true that only thirty-six hours separated the jury's verdict and the commencement of the sentencing hearing, Beuke's attorneys had two-and-a-half months to prepare for the guilt and penalty phases of the trial. And as we address further below, the record does not establish that counsel did not prepare for the penalty phase during that pre-trial period.

Beuke's claim additionally fails because he has not established prejudice from the trial court's denial of his request for a continuance. Beuke contends that the trial court deprived him of the opportunity to investigate and present mitigation evidence showing: he did not have many friends; he held a low opinion of himself; he had a need to prove himself to others; he was a haphazard follower; he exhibited extreme personality traits; he frequently used drugs; he was raised in a strict religious home where he was "always under a microscope"; his family lived frugally; his mother was timid; and his father was domineering. We fail to see how this evidence would have benefitted Beuke's mitigation defense and, in any event, the jury received much of this information through the testimony of Beuke's parents, who collectively testified that Beuke's father did not have a "well-paying job," their family did not have a lot of money, they attended church regularly, and their household was "run on the Ten Commandments." Mrs. Beuke also told the jury about an incident in Beuke's childhood where he did not get along with other children.[8] We conclude that Beuke has not shown prejudice resulting from the trial court's denial of his request for a continuance.

Because Beuke did not articulate a justifiable basis for a continuance, and because he failed to demonstrate prejudice resulting from the denial of his request, we find his claim to be without merit.

## H.       Ineffective Assistance of Counsel during the Penalty Phase

Beuke argues that his attorneys rendered ineffective assistance during the penalty phase. An ineffective assistance of counsel violation contains two components: (1) counsel's performance must have been deficient and (2) counsel's deficient performance must have prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We begin by considering the deficiency element. "[T]he proper standard for attorney performance is that of reasonably effective assistance" under "prevailing professional norms," and thus to establish deficient performance, the habeas petitioner must show that "counsel's performance fell below an objective standard of reasonableness." *Id.* at 687-88. When engaging in this inquiry, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

Beuke contends that his counsel rendered deficient performance at the penalty phase by: (1) requesting a presentence investigation, which revealed to the jury some prejudicial information,

---

[7] Beuke argues that his case is similar to *Powell v. Collins*, 332 F.3d 376, 396 (6th Cir. 2003), where the court granted habeas relief in part because the trial court denied the petitioner's motion for a continuance. *Powell* is inapposite because in that case the petitioner expressly requested the continuance "for the purpose of obtaining an additional psychiatric examination for presentation at the mitigation hearing." *Id.* In the present case, however, Beuke did not state a particular reason why the court should have granted his continuance, merely stressing that he had "inadequate" or "insufficient" time to prepare.

[8] Beuke also contends that, had the trial court granted his request for a continuance, he would have been able to prevent the jury from learning damaging evidence contained in the presentence investigation report. Ohio law, however, expressly mandates that where the defendant requests a presentence investigation, a copy of that report "shall be furnished . . . to the trial jury." Ohio Rev. Code § 2323.03(D)(1). Because Beuke asked the probation department to conduct a presentence investigation, he was required by state law to provide a copy of that report to the jury, and cannot claim prejudice on that basis.

including his criminal history and victim-impact statements; (2) obtaining an inadequate psychiatric evaluation from the probation department; and (3) presenting an inconsistent closing argument based on a "residual doubt" theory. Beuke first raised these arguments — as bases for his ineffective-assistance claim — in his petition for post-conviction relief, and the state appellate court found that "each of these issues could fairly have been made on direct appeal from Beuke's convictions" and thus each was "barred under the doctrine of *res judicata*." *Beuke*, 1991 WL 155219, at *4. Beuke entirely ignores — and most certainly does not challenge — the state court's finding that Beuke was procedurally barred from asserting these arguments, and we see no basis upon which to disturb the state court's resolution of this issue. We will, therefore, as the district court did, ignore these three bases for Beuke's ineffective-assistance claim.

Beuke next argues that his counsel performed deficiently at the penalty phase by failing to investigate mitigating factors. "[F]ailure to investigate possible mitigating factors and failure to present mitigating evidence at sentencing *can* constitute ineffective assistance of counsel under the Sixth Amendment." *Coleman*, 244 F.3d at 545; *see also Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003). Our circuit's precedent has distinguished between counsel's *complete* failure to conduct a mitigation investigation, where we are likely to find deficient performance, and counsel's failure to conduct an *adequate* investigation, where the presumption of reasonable performance is more difficult to overcome:

> [T]he cases where this court has granted the writ for failure of counsel to investigate potential mitigating evidence have been limited to those situations in which defense counsel have *totally* failed to conduct such an investigation. In contrast, if a habeas claim does not involve a failure to investigate but, rather, petitioner's dissatisfaction with the *degree* of his attorney's investigation, the presumption of reasonableness imposed by *Strickland* will be hard to overcome.

*Campbell v. Coyle*, 260 F.3d 531, 552 (6th Cir. 2001) (quotation omitted) (emphasis added); *see also Moore v. Parker*, 425 F.3d 250, 255 (6th Cir. 2005). In the present case, defense counsel did not *completely fail* to conduct an investigation for mitigating evidence. Counsel spoke with Beuke's parents prior to penalty phase of trial (although there is some question as to how much time counsel spent preparing Beuke's parents to testify), and presented his parents' testimony at the sentencing hearing. Defense counsel also asked the probation department to conduct a presentence investigation and a psychiatric evaluation. While these investigatory efforts fall far short of an exhaustive search, they do not qualify as a complete failure to investigate. *See Martin v. Mitchell*, 280 F.3d 594, 613 (6th Cir. 2002) (finding that defense counsel did not completely fail to investigate where there was "limited contact between defense counsel and family members," "counsel requested a presentence report," and counsel "elicited the testimony of [petitioner's] mother and grandmother"). Because Beuke's attorneys did not entirely abdicate their duty to investigate for mitigating evidence, we must closely evaluate whether they exhibited specific deficiencies that were unreasonable under prevailing professional standards. *See Dickerson v. Bagley*, 453 F.3d 690, 701 (6th Cir. 2006).

Beuke specifically alleges that his attorneys' performance was deficient because they unreasonably delayed their mitigation investigation until after the jury issued its guilty verdict and thus failed to conduct an adequate mitigation investigation. We will generally find that an attorney has rendered deficient performance if he waits until after a conviction to begin his mitigation investigation. *See Greer v. Mitchell*, 264 F.3d 663, 676-77 (6th Cir. 2001) (finding deficient performance where it "appear[ed] that trial counsel did not begin preparing for the mitigation phase of the trial until after conviction); *Glenn v. Tate*, 71 F.3d 1204, 1207 (6th Cir. 1995) (finding deficient performance where "the lawyers made virtually no attempt to prepare for the sentencing phase of the trial until after the jury returned its verdict of guilty").

After reviewing all the evidence, we conclude that Beuke has not established that his attorneys waited until after the jury issued its guilty verdict to begin their mitigation investigation. Beuke is apparently asking this court to assume, based primarily on his attorneys' request for a continuance prior to the sentencing hearing, that they did not begin their preparations prior to the jury's conviction. That assumption, however, rests on sheer speculation. The evidence in the record is not clear as to when trial counsel began their mitigation investigation and what that investigation entailed. In their affidavits, Beuke's attorneys both state that they "expend[ed] an extraordinary amount of hours in preparation for trial, the trial itself, and post[-]trial matters, including the preparation for the penalty phase." While counsel's itemized billable hours sheets expressly identify only the day between the guilt and penalty phases as "preparation for mitigation hearing," those itemized sheets indicate that many pre-conviction billable hours were spent at the "county jail," in "conference with Beuke's parents," "review[ing] psychiatric reports," and in "review of law and preparation." Some or all of these activities could have been focused on the mitigation investigation; Beuke has not provided enough evidence to confirm or deny that conclusion. As the habeas petitioner, Beuke has the burden of establishing his counsel's deficient performance, and he has failed to present evidence from which we can find such deficiency. *See Carter v. Mitchell*, 443 F.3d 517, 531 (6th Cir. 2006) (noting that the petitioner "provided no basis for a finding that trial counsel's investigation was unreasonable" because he did not introduce "any statement from trial counsel describing what [counsel] did or did not do in investigating [the petitioner's] background").

Even if we were to find trial counsel's performance to be deficient, Beuke cannot establish the prejudice prong of his ineffective-assistance claim, which requires him to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Darden v. Wainwright*, 477 U.S. 168, 184 (1986). "When a [petitioner] challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. Thus, "we reweigh the evidence in aggravation against the totality of available mitigating evidence," which includes the mitigation evidence that was omitted because of counsel's alleged deficiencies. *Harries v. Bell*, 417 F.3d 631, 639 (6th Cir. 2005). The petitioner "need only show that one juror would have reached a different result to establish prejudice." *Gillard v. Mitchell*, 445 F.3d 883, 896 (6th Cir. 2006).

A petitioner does not establish prejudice if he shows only that his counsel failed to present "cumulative" mitigation evidence, that is, evidence already presented to the jury. *Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006). "[T]o establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way — in strength and subject matter — from the evidence actually presented at sentencing." *Clark v. Mitchell*, 425 F.3d 270, 286 (6th Cir. 2005). Beuke contends that he was prejudiced by his counsel's failure to demonstrate the complexities of his life, which include his family's poverty, his oppressive and overprotective parents, his low self-esteem, his history of drug use, and his destructive relationship with Michael Cahill. We find that this undisclosed mitigation evidence mirrors the evidence introduced during the penalty phase. Beuke's father testified about the family's minimal financial resources, indicating that he did not have a well-paying job and that they had very little money. Both parents' testimony was permeated with references to their religious beliefs and activities, and Beuke's mother stated that their household was "run on the Ten Commandments," suggesting the structured, and perhaps overprotective, nature of Beuke's upbringing. Moreover, the presentence investigation, which was submitted to the jury, disclosed Beuke's history of drug abuse, and thus the jury was aware of this information. Finally, Cahill's testimony at trial indicated that he asked Beuke to participate in a fake bank robbery, which certainly demonstrated Cahill's negative influence on Beuke. *See Gillard*, 445 F.3d at 896 (noting that the "jury was privy" to evidence introduced during the guilt phase of trial and counsel need not reintroduce it during the sentencing hearing). The presentence investigation also showed the destructive and manipulative nature of Beuke's relationship with Cahill by

including Beuke's statements that he committed these offenses for the purpose of obtaining a car to commit a bank robbery with Cahill and that he "wished [he] never would have gotten involved with Michael Cahill." Because little of Beuke's undisclosed mitigating evidence differs substantially from evidence already presented to the jury, Beuke has failed to show prejudice.

To be sure, some of the undisclosed mitigating evidence was not cumulative — such as evidence of Beuke's low self esteem and the degree of his parent's sheltering. But we find that this non-cumulative evidence is not powerful mitigating evidence that is reasonably likely to have changed the jury's recommendation of death. Evidence that Beuke was raised in a "very orthodox Catholic" home, that he had a "highly structured childhood environment," that he was "very spoiled," and that he had "an overwhelming need to be accepted by others" hardly discloses sympathetic details that would soften the jury's impression of him. Instead, this undisclosed evidence portrays the life of a fairly typical adolescent or young adult growing up in "a relatively stable, although imperfect, family environment" surrounded by parents who — while perhaps a little overbearing — have loved, supported, and protected him throughout his life. We find that such evidence would not have elevated the jurors' sympathies for Beuke and thus fails to create a reasonable probability that the jurors — had they been able to consider it — would have altered their recommendation of death. *See Carter*, 443 F.3d at 531 (finding no prejudice where the proffered mitigating evidence revealed "a relatively stable, although imperfect, family environment" with no evidence of abuse). In contrast, undisclosed mitigating evidence supporting a finding of prejudice usually reveals shocking, disheartening, and utterly disturbing details about the petitioner's upbringing. *See, e.g.*, *Wiggins*, 539 U.S. at 534-35 (finding prejudice where the undisclosed mitigating evidence showed that the petitioner was physically abused by his alcoholic mother and sexually molested by his foster parents); *Williams v. Taylor*, 529 U.S. 362, 398 (2000) (finding prejudice where the undisclosed mitigating evidence consisted of "the graphic description of [the petitioner's] childhood, filled with abuse and privation"); *Harries*, 417 F.3d at 639 (finding prejudice where the undisclosed mitigating evidence would have shown petitioner's "traumatic childhood," which included "significant physical abuse" such as being "choked so severely that his eyes hemorrhaged"); *Johnson v. Bell*, 344 F.3d 567, 574 (6th Cir. 2003) (collecting similar cases).

Taking all this into consideration, we conclude by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." *Harries*, 417 F.3d at 639. On the aggravation side of the equation, we have the jury's verdict of guilty on the two statutory specifications — (1) committing aggravated murder as part of a course of conduct involving the purposeful attempt to kill two or more persons, and (2) committing aggravated murder in the course of an aggravated robbery — and the cruel and heartless manner in which Beuke committed these offenses. On the mitigation side — after accounting for Beuke's largely cumulative and otherwise unsympathetic evidence — we are left basically where we started. The balance of the aggravation-mitigation scale remains unchanged, and we do not find that presenting this undisclosed mitigating evidence to the jury would have altered the results of these proceedings, *see Darden*, 477 U.S. at 184, or that there is a reasonable probability that even one juror, having reviewed this evidence, would have reached a different result. *See Gillard*, 445 F.3d at 896.

## I.        Prosecutorial Misconduct — Closing Argument at the Penalty Phase

Beuke contends that the prosecutor's closing argument during the penalty phase violated his due process rights. For the prosecutor's misconduct to violate the defendant's due process rights, it "is not enough that the prosecutors' remarks were undesirable or even universally condemned"; instead those comments must "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor," because "the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." *Smith v. Phillips*, 455 U.S. 209, 219

(1982) (quotations omitted).  To succeed on this claim, the petitioner must demonstrate that the prosecutor's conduct was both improper and flagrant.  *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005).

We begin by determining whether the prosecutor's comments were improper.  Beuke challenges five categories of statements made by the prosecutor during closing argument: (1) statements indicating that the death penalty sends a deterrent message to criminals and a reassuring message to the law-abiding public; (2) statements where the prosecutor allegedly relied on his own personal experience to persuade the jury; (3) statements about the victims of the attempted murders, Wahoff and Graham; (4) statements indicating the prosecutor's personal fear of Beuke; and (5) statements warning the jurors that Beuke could be paroled if he did not receive a death sentence.

We turn first to Beuke's challenge to the prosecutor's statements about the need for the jury to send a deterrent message to criminals and a reassuring message to the public.  The prosecutor began his closing argument with broad statements about the death penalty in general, noting that "our society will take a life" in order "to let a message ring out" to "[c]riminals and potential criminals in this community [that] we won't tolerate this."  The prosecutor also stated that in instances where aggravating circumstances sufficiently outweigh mitigating factors, the death penalty sends "a message of justice[] to the law-abiding people in the community," and "[t]he only way [the public] can be satisfied . . . is if capital punishment is measured out[.]"  Beuke characterizes these statements as urging the jurors to impose the death penalty as part of their civic obligation to deter criminal activity and satisfy the community.  This is not a fair characterization of the prosecutor's statements.  When considered in context, these statements are general background information on the death penalty and the need to punish guilty people, rather than an impassioned command that the jurors must recommend death based on some amorphous societal obligation. On direct appeal, the Ohio Supreme Court made the same assessment of these statements by acknowledging that "these comments consist[ed] of a general discussion of the death penalty." *Beuke*, 526 N.E.2d at 280.  We accordingly find that the prosecutor's discussion of background information on the death penalty and the need to punish guilty people — devoid of any overt attempt to incite the passions of the jurors — was not improper under the circumstances. *See Byrd*, 209 F.3d at 538-39 (noting that the prosecutor's comments were not necessarily improper because he did not "ask the jury to send a message to other potential murderers or robbers," rather he discussed "the purpose of capital punishment as a way of arguing that the jury should find that these purposes would be served by imposing the death penalty on [p]etitioner"); *Hicks*, 384 F.3d at 219 (acknowledging that a prosecutor may properly make "general references to the societal need to punish guilty people").

Beuke next argues that the prosecutor engaged in misconduct by referencing his own personal experience.  "It is well-established law that a prosecutor cannot express his personal opinions before the jury." *Bates*, 402 F.3d at 644 (quotations omitted).  The allegedly offensive comments occurred when the prosecutor stated:

> [I]f there ever was a case for the death penalty, it is this case right here. . . . If there ever was a case that fits the specifications more closely to a course of criminal conduct, shooting, killing people, it is this case right here. . . . This crime stands out in your mind as being a terrible act, something that just can't be forgotten by the members of this community.

Again Beuke attempts to mischaracterize these statements as an appeal to the prosecutor's personal experience.  On the contrary, the prosecutor did not improperly interject his own assessment of the facts or evidence — such as stating, for example, "I have tried several murder cases and find this to be one of the worse," *see United States v. Galloway*, 316 F.3d 624, 632-33 (6th Cir. 2003)

(finding a prosecutor's statements to be improper where he stated, "I have tried several cases myself where we see the [defendant make this argument]"), or stating, "I do not find the defendant's mitigating evidence to be at all credible," *see Bates*, 402 F.3d at 644-45 (finding a prosecutor's statements to be improper where he stated, when discussing the testimony of mitigation witnesses, "You don't believe that, and I don't believe it [either]"). Rather, the prosecutor here merely said that because of the stark facts and lack of mitigating evidence, this case was appropriate for the death penalty. Far from relying on his own experience, the prosecutor implored the jurors to determine whether Beuke's "terrible acts" "stand[] out" as particularly egregious in *their own minds*. Because the prosecutor did not appeal to his own personal experience, we do not find these statements to be improper.

Beuke next challenges the prosecutor's numerous references to the victims of the attempted murders, Wahoff and Graham. During his closing argument, the prosecutor discussed the impact of Beuke's actions on all three of the victims: Craig, Wahoff, and Graham. He noted that Wahoff tried to help Beuke by offering him a ride and, in return for his benevolence, was shot in the back and now "sits paralyzed for the rest of his life." He then told the jury to "think about Mr. Wahoff . . . and his little babies" and "[h]is little girl[] who he will never dance with because he is paralyzed." Beuke argues that the prosecutor should not have referred to Wahoff, Graham, or their families because the aggravated murder of Robert Craig, not the attempted murders of Wahoff and Graham, was the only offense relevant at the sentencing hearing. This argument fails to appreciate that Beuke's eligibility for a death sentence depended on the jury's finding that Beuke murdered Craig as part of a course of conduct involving the purposeful attempt to kill two or more persons. *See* Ohio Rev. Code § 2929.04(A). Beuke's attempted murders of Wahoff and Graham were part of the conduct that rendered him death-penalty eligible under Ohio law, and it was not inappropriate for the prosecution to discuss the impact of Beuke's conduct on those victims and their families. *See Payne*, 501 U.S. at 827 (holding that the Constitution "erects no *per se* bar" to "the admission of victim impact evidence and prosecutorial argument on that subject").[9]

---

[9] To the extent that Beuke is challenging the quantity or pervasiveness of the victim-impact evidence discussed during the prosecutor's closing argument, something that is not at all clear from his brief, we find such an argument to be without merit. Beuke's brief expressly acknowledges that both *Booth v. Maryland*, 482 U.S. 496, 509 (1987) (holding that the introduction of victim-impact evidence "at the sentencing phase of a capital murder trial violates the Eighth Amendment"), and *South Carolina v. Gathers*, 490 U.S. 805, 811 (1989) (extending the holding of *Booth* to prohibit a prosecutor from referencing victim-impact evidence at sentencing), have been explicitly overruled by *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), which held that "the Eighth Amendment erects no *per se* bar" to "the admission of victim impact evidence and prosecutorial argument on that subject." Although the Court's decision in *Payne* removed any *per se* constitutional bar to the prosecutor's use of victim-impact evidence, we have recognized that excessive or prejudicial references to victim-impact evidence might "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *See Roe v. Baker*, 316 F.3d 557, 565-66 (6th Cir. 2002); *see also Payne*, 501 U.S. at 825 ("In the event [victim-impact] evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief."). While the prosecutor in the present case made numerous references to all the victims and their families, we do not find that any of these statements in isolation — or in their cumulative effect — resulted in a fundamentally unfair trial. Many of the statements at issue here are reminiscent of those found in *Payne*, where the Court upheld the death sentence of the petitioner, who had been convicted of the brutal murder of a mother and her two-year-old child. *Id.* at 830. For example, the prosecutor here stated, Wahoff will "never dance with" "[h]is little girl" "because he is paralyzed," and the prosecutor in *Payne* similarly said, "[The victim] will never kiss [her son] good night[,] or pat him as he goes off to bed, or hold him and sing him a lullaby." *Id.* at 816. Additionally, the prosecutor here stated, "[Robert Craig] has got a little boy at home who doesn't have a dad," and the prosecutor in *Payne* correspondingly said, "[The infant victim's little brother] mourns . . . every single day and wants to know where his best little playmate is." *Id.* Finally, the prosecutor here conjectured that the families of the victims will one day ask, "What is going to happen to the guy that [committed these crimes]?" And the prosecutor in *Payne* similarly stated, "Somewhere down the road [the victim's son] is going to grow up . . . He is going to want to know what happened. With your verdict, you will provide the answer." *Id.* at 815. We find these cases to be materially indistinguishable, and conclude that Beuke's conviction and sentence must be affirmed.

In contrast, we find that the last two prosecutorial statements challenged by Beuke were improper. At the end of his closing argument, the prosecutor stated that he was "scared to death of [Beuke]" and did not "want him out on the street again." The prosecutor then concluded by likening Beuke to a "cancer" on society, instructing the jurors that, even though "[i]t is going to hurt quite a bit," they should "proceed through an operation to remove that cancer." He also noted that if they chose some lesser treatment, "there is no guarantee [that the cancer] is not going to kick back up again and spread." Defense counsel objected to these and other statements, but the trial court overruled the objections and instructed the jurors on multiple occasions: "What counsel says to you in closing argument is not evidence. It is not the law. But [he] . . . can make reasonable inferences based upon what the evidence is, and you determine what the evidence is."

"It is well-established law that a prosecutor cannot express his personal opinions before the jury," *Bates*, 402 F.3d at 644 (quotations omitted); thus it was improper for the prosecutor to reference his personal fear of Beuke. Moreover, a prosecutor cannot make statements "calculated to incite the passions and prejudices of the jurors," *Gall v. Parker*, 231 F.3d 265, 315 (6th Cir. 2000), *overruled on other grounds as recognized in Bowling*, 344 F.3d at 501 n.3; thus the prosecutor acted improperly by appealing to the juror's fears that Beuke would commit additional crimes if he was eventually released from prison, *see Broom*, 441 F.3d at 413 (stating that it was improper for the prosecutor to imply that the petitioner "would commit future rapes if he was released from prison").

Having determined that the prosecutor made some improper statements, we must determine whether these comments were flagrant enough to "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181.

> [F]our factors are considered in determining whether the challenged conduct is flagrant: (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant.

*Bates*, 402 F.3d at 641. First, we find it is unlikely that the prosecutor's improper statements misled the jury. His improper statements did not mischaracterize the applicable law or the relevant evidence, *see Darden*, 477 U.S. at 181-82 (finding no due process violation where the prosecutor "did not manipulate or misstate the evidence"), but merely reflected a somewhat overzealous attempt to persuade the jury, *see Byrd*, 209 F.3d at 532 ("[T]he state should not be required to present . . . closing arguments that are devoid of all passion.") (second alteration in original). Second, these improper statements were isolated, and not pervasive; third, the prosecutor deliberately made these improper statements; fourth, we recognize that the prosecution produced strong aggravating evidence against Beuke at sentencing. After balancing these factors, we conclude that the prosecutor's improper statements were not flagrant and therefore did not violate Beuke's due process rights. *See Broom*, 441 F.3d at 413-14. Our conclusion is buttressed by the trial court's numerous cautionary instructions informing the jurors "that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence." *Darden*, 477 U.S. at 182; *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974) ("[T]he trial court took special pains to correct any impression that the jury could consider the prosecutor's statements as evidence in the case.").

## J.      Eighth Amendment — Jury Instruction to Avoid Any Considerations of Sympathy

Beuke contends that the trial court violated his Eighth Amendment rights by instructing the jury not to consider sympathy when issuing its recommended sentence. At one point during the

mitigation hearing, Beuke's father began to weep during his testimony, necessitating a brief recess. Upon recommencement of the hearing, the trial judge stated:

> Ladies and gentlemen — and we do this because of the unfortunate incident which just happened here a moment ago — in your deliberations — you must not be influenced in your deliberations by any consideration of sympathy or prejudice. The Court will further tell you now, and we will tell you when this matter is finally submitted to you, it is your duty to carefully weigh the evidence, decide all the disputed questions of fact, apply the instructions of the Court to your findings, and render your verdict accordingly. And in fulfilling your duty, your efforts must be to arrive at a just verdict. Consider all the evidence and make your findings with intelligence, impartiality, without bias, sympathy, or prejudice, so that the State of Ohio and this defendant will feel that this proceeding was fairly and impartially tried.

The trial court reiterated these sentiments in its jury instructions given at the conclusion of the mitigation hearing.

Beuke contends that the trial court violated his constitutional rights by (1) referring to his father's testimony as an "unfortunate incident" and (2) instructing the jurors that they "must not be influenced . . . by any consideration of sympathy or prejudice." We reject these arguments. First, it is abundantly clear that the "unfortunate incident" to which the trial court referred was not Beuke's father's testimony, but his father's weeping, which interrupted the hearing. Second, the Supreme Court upheld a similar jury instruction against an Eighth Amendment attack in *California v. Brown*, 479 U.S. 538 (1987). In *Brown*, the California trial court instructed the jury "not to be swayed by 'mere sentiment, conjecture, sympathy, passion, prejudice, public opinion[,] or public feeling.'" *Id.* at 542. Here the Ohio trial court told the jury not to be influenced "by any consideration of sympathy or prejudice." Beuke argues that *Brown* is distinguishable because the instruction in that case prohibited consideration of "mere sympathy," whereas, here, the instruction prohibited "any consideration of sympathy." While we acknowledge this minor distinction between the instruction in *Brown* and the instruction here, we conclude that this distinction is immaterial because the instruction in the present case fully satisfies the constitutional principles expressed in *Brown*.

The Eighth Amendment requires "that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (alteration in original). Beuke believes that the instruction at issue here, by prohibiting the jurors from making their findings based on sympathy, violates this constitutional principle. The Court's decision in *Brown* recognized that when reviewing a jury instruction for constitutional error, we must not only consider the "specific language challenged," but must also "review the instructions as a whole." *Brown*, 479 U.S. at 541. The entire instruction here exhorted the jurors to "carefully weigh the evidence," "apply the instructions of the Court," "consider all the evidence," and "make . . . findings with intelligence [and] impartiality, [and] without bias, sympathy, or prejudice." When read in the context of the entire instruction, we conclude that a reasonable juror would perceive the court's specific admonition to "not be influenced . . . by any consideration of sympathy" as a "directive to ignore only the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase." *Id.* at 542. Moreover, a reasonable juror hearing this entire instruction — which emphasized the need to "weigh the evidence," "apply the instructions of the Court," and "consider all the evidence" — would logically "conclud[e] that [the instruction] was meant to confine the jury's deliberations to consideration arising from the evidence presented, both aggravating and mitigating." *See id.* at 543. By "help[ing] to limit the jury's consideration to matters introduced in evidence," this instruction — far from violating the Constitution — actually "fosters the Eighth Amendment's 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" *See id.*

(quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)).  We thus find, relying primarily on the Supreme Court's decision in *Brown*, that the trial court's instructions did not violate Beuke's Eighth Amendment rights.

Beuke also contends that the timing of the instruction — in the middle of his father's testimony — and the directive not to indulge "any consideration of sympathy" effectively communicated to the jurors that they should disregard his father's testimony.  We find Beuke's argument to be quite a stretch in light of the entire record; a reasonable juror certainly would not have interpreted the judge's instruction as a directive to disregard the testimony of Beuke's father.  The instruction explicitly commanded the jurors to "consider all the evidence," which included Beuke's father's testimony.  And more importantly, the trial court, after giving this instruction, allowed Beuke's father to continue his testimony, which would indicate to a reasonable juror that his testimony was relevant and worthy of consideration.  Had the court intended the jurors to disregard this testimony, or had the court wished to convey such a message, it would have terminated his testimony at that point, and not allowed him to continue.  Accordingly, Beuke's claim is without merit.

## K.      Constitutionality of Ohio's Death Penalty Scheme

Beuke next challenges the constitutionality of Ohio's death penalty scheme.  His arguments are entirely meritless and have been rejected by this court on numerous occasions.  We therefore will afford them minimal attention.

Beuke first contends that Ohio's death penalty scheme violates the Supreme Court's decision in *Lowenfield v. Phelps*, 484 U.S. 231 (1988), because it does not sufficiently narrow the class of murderers eligible for the death penalty.  Beuke's argument lacks merit in light of our many cases holding that the Ohio death penalty scheme is consistent with *Lowenfield*.  *See*, *e.g.*, *Coleman v. Mitchell*, 268 F.3d 417, 443 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 369-70 (6th Cir. 2001); *Smith v. Mitchell*, 348 F.3d 177, 214 (6th Cir. 2003).

Beuke next asserts that the Ohio appellate courts failed to determine whether his sentence was proportionate to the penalty imposed in similar cases or, put differently, that the Ohio courts failed to review his sentence for comparative proportionality.  Beuke specifically contends that his death sentence was disproportionate to the sentences imposed against ten other defendants who were convicted of aggravated murder in the same Ohio county but who did not receive the death penalty.  This claim is meritless.

This circuit has consistently interpreted the Supreme Court precedents to hold that comparative proportionality review is not required by the Constitution.  Most recently, in our en banc opinion in *Getsy v. Mitchell*, 495 F.3d 295 (6th Cir. 2007), we explained the distinction between the proportionality required by the Eighth Amendment and the comparative proportionality that the petitioner in *Getsy* — like Beuke in the case before us here — sought.

> Eighth Amendment proportionality, as defined by the Supreme Court, refers "to an abstract evaluation of the appropriateness of a sentence for a particular crime."  Proportionality as defined by the Supreme Court evaluates a particular defendant's culpability for his crime in relation to the punishment that he has received.

*Getsy*, 495 F.3d at 305 (internal citations omitted).  In those cases in which the Supreme Court has struck down a death sentence on proportionality grounds, we went on to say, the disproportionality was not in relation to sentences received by other similarly situated defendants; the disproportionality of the sentence was in relation to the particular crime that the particular defendant had committed.  *Id.*  Citing *Pulley v. Harris*, 465 U.S. 37 (1984), and *McCleskey v. Kemp*, 481 U.S. 279 (1987), we pointed out that the Supreme Court has "expressly held that a defendant could not

prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty." *Getsy*, 495 F.3d at 305 (internal quotation marks omitted).

Because Beuke bases his comparative proportionality argument on other defendants who did not receive the death penalty, his argument is directly foreclosed by our decision in *Getsy*. Moreover, we have upheld the proportionality review of Ohio's death penalty scheme against various innovative constitutional challenges, *see Getsy*, 495 F.3d at 306; *Byrd*, 209 F.3d at 539; *Buell*, 274 F.3d at 368-69; *Cooey*, 289 F.3d at 928; *Smith*, 348 F.3d at 214; *Wickline v. Mitchell*, 319 F.3d 813, 824-25 (6th Cir. 2003); *Williams v. Bagley*, 380 F.3d 932, 962-63 (6th Cir. 2004), and Beuke has failed to distinguish or otherwise undermine this wealth of legal authority.

## L.        Beuke's Evidentiary Motions

Beuke argues that the district court abused its discretion by denying (1) his motion to expand the record pursuant to Rule 5 of the Rules Governing Section 2254 cases, (2) his motion to expand the record pursuant to Rule 7 of the Rules Governing Section 2254 cases, (3) his motion for leave to conduct discovery pursuant to Rule 6 of the Rules Governing Section 2254 cases, and (4) his request for an evidentiary hearing. Even though Beuke commenced this habeas action in May 1994, he did not file his motions to expand the record or motion for leave to conduct discovery until September 1995, less than one month before the district court issued its order dismissing his habeas petition. Moreover, Beuke did not file a formal motion requesting an evidentiary hearing; instead this request was tucked deep within his lengthy habeas petition.

### 1.        Motions to Expand the Record

Rule 5 of the Rules Governing Section 2254 cases, as it existed when Beuke filed his habeas petition, provided that "[t]he court on its own motion or upon request of the petitioner may order that further portions of the existing transcripts be furnished or that certain portions of the non-transcribed proceedings be transcribed and furnished." The former version of Rule 7 similarly stated: "[T]he judge may direct that the record be expanded by the parties by the inclusion of additional materials relevant to the determination of the merits of the petition." We have recognized that expansion of the record in habeas cases "is not mandatory . . . and is left to the discretion of the trial judge." *Ford v. Seabold*, 841 F.2d 677, 691 (6th Cir. 1988). We review the district court's denial of a motion to expand the record for abuse of discretion. *Id.*

In his motions to expand the record, Beuke sought to introduce (1) nine documents referenced in the state court trial transcripts, (2) all prior statements that Michael Cahill and other prosecution witnesses made to the authorities, and (3) background information regarding Robert Craig. Beuke asserted that the prosecution failed to provide him with most of these documents prior to trial and that these documents were essential to his *Brady* claim. The district court denied both of Beuke's motions to expand the record. The court's order reviewed the procedural history of the case, noting that at the time the parties were compiling the record before the district court, the court explicitly directed Beuke's counsel to "make a thorough review of the eight volume appendix . . . and advise [the state's] counsel . . . of any documents not included in the appendix which [were] relevant to a claim in the federal habeas corpus petition[.]" Counsel for both parties thereafter stated that they had "reached agreement as to the documents [Beuke] sought to include in the appendix." More than three months later, however, Beuke's counsel filed these motions to expand the record. After reviewing this procedural history, the district court reasoned:

> [Beuke] has failed to make any showing that the [proffered] documents . . . are necessary to a full and fair consideration of his claims by this Court. [Beuke] had the opportunity to make the documents . . . part of the record at trial and on direct appeal

but failed to do so.  He has made no showing of cause for that failure, nor has he demonstrated that inclusion of the documents in the record before this Court would establish his right to relief in federal habeas corpus. . . . Most of the documents go to the alleged unreliability of Michael Cahill and to alleged inconsistencies between his prior statements or the statements of other persons and Cahill's trial testimony.

None of the alleged inconsistencies goes to a fact material to [Beuke's] conviction. . . . Briefly summarized, the evidence of [Beuke's] guilt is overwhelming. [The district court then summarized the wealth of physical evidence against Beuke.]

We find that the district court did not abuse its discretion in denying Beuke's motions to expand the record.  Beuke's counsel had adequate opportunities to include the proffered documents in the record; the district court even instructed him to "advise [the state's] counsel . . . of any documents not included in the appendix which [were] relevant" to his claims.  More importantly, Beuke did not demonstrate how these documents would further any of his constitutional claims.  In his motions to expand the record, Beuke primarily argued that these documents would support his *Brady* claim.  We have already concluded that these proffered documents do not satisfy *Brady*'s materiality requirement, and thus affirm the district court's finding that these documents would not have furthered Beuke's *Brady* claim.  Consequently, the district court did not abuse its discretion by denying Beuke's motions to expand the record.[10]

## 2.     Motion for Leave to Conduct Discovery

"Habeas petitioners have no right to automatic discovery." *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001).  Rule 6 of the Rules Governing Section 2254 cases, as it existed when Beuke filed his habeas petition, stated that "[a] party shall be entitled to invoke the processes of discovery . . . if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so[.]"  We review the district court's denial of a discovery request for abuse of discretion.  *Stanford*, 266 F.3d at 460.

In his motion for leave to conduct discovery, Beuke presented numerous requests for documents and depositions.  The evidence requested in the motion for leave to conduct discovery sought the same information requested in the motions to expand the record.  The district court denied the discovery motion for the same reasons it denied the motions to expand the record, namely, because Beuke had not established that the requested discovery was unavailable during direct appeal, and because Beuke had not shown that the requested discovery would uncover evidence of a constitutional violation.  For the same reasons we found that the district did not abuse its discretion by denying the motions to expand the record, we likewise find that the district court did not abuse its discretion by denying the motion for leave to conduct discovery.  *See Williams*, 380 F.3d at 976 (finding that a district court did not abuse its discretion by denying a petitioner's request to conduct discovery where the petitioner did not show "that the requested discovery could yield evidence enabling [him] to prevail on his [habeas] claim").

---

**10** Beuke objects to the district court's statement that he should have introduced the proffered documents on direct appeal in state court, contending that these documents could not have been added to the state court record because the prosecution failed to provide these documents in violation of *Brady*.  Even if we were to agree with Beuke on this issue, we nevertheless would conclude that the district court did not abuse its discretion by denying his motions to expand the record because the court did not rely solely on Beuke's failure to introduce these documents on direct appeal, but relied as well on Beuke's failure to demonstrate that these documents would have supported his habeas claims. Because we find the district court's alternative basis to be a sufficient basis for denying the motions to expand the record, we conclude that the district court did not abuse its discretion.

### 3.        **Request to Conduct an Evidentiary Hearing**

Beuke did not file a separate motion requesting an evidentiary hearing, but merely inserted this request in one sentence on the second-to-last page of his 306-page amended habeas petition, unaccompanied by any supporting argument. The district court — apparently unmoved by Beuke's undeveloped request for a hearing — dismissed Beuke's habeas petition without holding the requested hearing. Shortly after the court dismissed the petition, Beuke filed a motion to alter or amend the judgment, arguing among other things that the district court should have held an evidentiary hearing prior to adjudicating his petition. The court denied this motion because Beuke did not demonstrate his entitlement to an evidentiary hearing under 28 U.S.C. § 2254(d).

Under pre-AEDPA law, a district court need not conduct an evidentiary hearing "unless one of the eight circumstances listed in [former] 28 U.S.C. § 2254(d) is present." *McMillan v. Barksdale*, 823 F.2d 981, 983 (6th Cir. 1987) (citing *Loveday v. Davis*, 697 F.2d 135 (6th Cir. 1983)). These circumstances include:  (1) when a factual dispute is not resolved in state court; (2) when the state court's factfinding procedure is inadequate to afford a full and fair hearing; (3) when material facts are not adequately developed in state court; (4) when the state court lacks jurisdiction; (5) when the state court fails to appoint counsel; (6) when the petitioner does not receive an adequate hearing in state court; (7) when the petitioner is denied due process in state court; and (8) when the district court determines that a material fact determination is not fairly supported by the record. 28 U.S.C. § 2254(d) (1994). "These circumstances must be shown by the petitioner, admitted by the State, or 'otherwise appear' from the record." *McMillan*, 823 F.2d at 984.

The district court did not err by denying Beuke's habeas petition without first holding an evidentiary hearing.  Beuke did not demonstrate to the district court that any of the eight circumstances under former 28 U.S.C. § 2254(d) were satisfied; in fact Beuke did not present *any* argument to the district court on his request for an evidentiary hearing. Moreover, our independent review of the record confirms that none of these requisite circumstances were satisfied, and we thus conclude that the district court did not err in failing to conduct an evidentiary hearing. *See Ford*, 841 F.2d at 691.

### III.

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

———————————

**DISSENT**

———————————

BOYCE F. MARTIN, JR., Circuit Judge, dissenting.  Because I cannot agree with the majority's holding that the prosecutorial misconduct during closing arguments of the penalty phase of Beuke's trial did not infect the trial with unfairness resulting in an unconstitutional denial of due process, I respectfully dissent.

I.

While it is obvious that the crime for which Beuke was convicted was heinous and the evidence presented against him was voluminous, it is in exactly such circumstances that we, as officers of the Court, must ensure that Beuke receives a fair trial in front of an impartial jury.  *See Irwin v. Dowd*, 366 U.S. 717, 721-22 (1961); *Groppi v. Wisconsin*, 400 U.S. 505, 509 (1971) ("In essence, the right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process . . . This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies.").

The prosecutorial misconduct was so egregious and inflammatory, that I have grave doubts about the fairness and integrity of Beuke's penalty phase hearing.  Justice Wright, dissenting from the Ohio Supreme Court's upholding of Beuke's conviction, stated it well: "[w]hile isolated instances of prosecutorial misconduct or overzealousness may be tolerated in many circumstances and indeed prove 'harmless,' there comes a point where the cumulative effect of improper remarks and of untoward conduct by the state constitutes reversible error." *State v. Beuke*, 526 N.E.2d 274, 291 (Ohio 1988).

II.

As stated by the majority, in order for this Court to reverse Beuke's conviction, a prosecutor's comments must so infect the trial "with unfairness as to make the conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  We have held that "reversal is required if the prosecutor's misconduct is "so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant." *Bates v. Bell*, 402 F.3d 635, 642 (6th Cir. 2005).  To succeed on his claim, Beuke must demonstrate that the prosecutor's conduct was both improper and flagrant.  *Id.* at 641. We first determine if the challenged conduct was improper.  It is obvious to any objective observer that the closing arguments of the prosecution were blatantly improper.

The majority analyzes five categories of statements made by the prosecutor that are challenged by Beuke:  (1) statements indicating that the death penalty sends a deterrent message to criminals and a reassuring message to the law-abiding public; (2) statements where the prosecutor allegedly relied on his own personal experience to persuade the jury; (3) statements about the victims of the attempted murders, Wahoff and Graham; (4) statements indicating the prosecutor's personal fear of Beuke; and (5) statements warning the jurors that Beuke could be paroled if he did not receive a death sentence.

The majority actually concedes that the second and fifth categories – the prosecutor's personal fears and warnings about Beuke killing again – were improper.  I would hope so.  The prosecutor stated that he was "scared to death of that man," and he did not "want him out on the street again."  It is beyond question that such personal arguments are grossly improper.  *See Bates*,

402 F.3d at 644 ("It is well-established law that a prosecutor cannot express his personal opinions before the jury." (internal quotation marks omitted)). The majority also found improper the prosecutor's likening of Beuke to a "cancer" that needed to be "cut-out" so that it would not "kick back up again and spread." The majority found these statements were improperly calculated to appeal "to the juror's fears that Beuke would commit additional crimes if he was [sic] eventually released from prison."

But the majority found the rest of the statements to be appropriate. I do not agree.

The beginning of the prosecutor's closing argument was "Make a message ring out. Criminals and potential criminals in this community, we won't tolerate this." After Beuke's attorney objected and was overruled, the prosecutor went on, stating the death penalty was "a message of justice, to the law-abiding people in this community," and "the only way they can be satisfied, to feel that justice has been done, is if capital punishment is measured out in a certain specific situation." The prosecutor concluded his argument by stating that "There is no other verdict that we can possibly come up with which would be a just verdict, which would be a verdict that we could live with, where we could say to ourselves that justice has been done in our community." The majority characterized these statements as "general background information on the death penalty and the need to punish guilty people, rather than an impassioned command that the jurors must recommend death based on some amorphous societal obligation." I respectfully disagree. I cannot imagine a more impassioned plea to a jury than a prosecutor beginning his closing argument by asking the jury to "[m]ake a message ring out." I fail to see how that statement deals with the general background of the death penalty. It is obvious that the prosecutor made a calculated decision to attempt to "arouse passion and prejudice and to inflame the jurors' emotions" regarding the mad hitchhiker killings "by urging them to send a message." *United States v. Solivan*, 937 F.2d 1146, 1153 (6th Cir. 1991). We have explicitly outlawed this type of prosecutor behavior. In *Solivan*, we stated that "[a] prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking." *Id.* (quoting *United States v. Monaghan*, 741 F.2d 1434, 1441 (D.C. Cir. 1984). The majority's holding should be identified for what it is, a contrived after-the-fact interpretation with expediency – rather than justice – as the end goal.

The prosecutor's statements regarding the victims of the attempted murders, Wahoff and Graham, were also improper. The majority held that it was proper for the prosecutor to discuss these victims because in order for Beuke to be death-penalty eligible, his murder of Robert Craig must have been part of a course of conduct involving the purposeful attempt to kill two or more persons — Wahoff and Graham. While the majority is correct in this statement, it is incorrect that the prosecutor is then allowed to purposely "make statements calculated to incite the passions and prejudices of the jurors." *Bates*, 402 F.3d at 642 (internal quotation marks omitted). The prosecutor asked the jury to "think about Mr. Wahoff, first of all, and his little babies." He continued:

> If you want to start feeling sorry for the defendant . . . , think about Mr. Wahoff and his little girl. His little girl, who he will never dance with because he is paralyzed. Think about his little boy that he talked about. He will never run with that little boy. He will never play baseball. . . . And he will never be able to dance with that little girl when she goes to high school. He will never play ball with that little boy.

While it is true that the shootings of Wahoff and Graham were aggravating circumstances under the law, the impact of those shootings on their families is not an aggravating circumstance and is in no way related to the murder of Robert Craig. Accordingly, I believe it is patently obvious that the prosecutor intentionally made "inappropriate and inflammatory remarks in violation of what this Court has described as the cardinal rule that a prosecutor cannot make statements calculated to incite the passions and prejudices of the jurors." *Id.* (internal quotation marks omitted).

Beuke also challenges the statements regarding the prosecutor's personal opinion that Beuke's case fit the specifications needed to be eligible for the death penalty.

> And if there ever was a case for the death penalty, it is this case right here. [Objection overruled]. If there ever was a case for a verdict of death and for the penalty of death, it is this case. If there ever was a case that fits the specifications more closely to a course of criminal conduct, shooting, killing people, it is this case right here. You think about the past 10 years, the kind of crimes that have been committed in this community, this crime. [Objection overruled]. This crime stands out in your mind as being a terrible act, something that just can't be forgotten by the members of this community.

Once again, the majority characterizes these inflammatory statements as not an appeal to the prosecutor's personal experience, but to the jury's past experience. I do not think the majority's holding is an accurate interpretation of the prosecutor's statements. It is obvious that the prosecutor believed this to be a heinous crime that the community had not seen in over a decade, and probably one of the worst in his career. He put his imprimatur on these opinions, imploring the jury to agree with him that this was a crime with no comparison in the community. *See United States v. Young*, 470 U.S. 1, 18-19 (1985) ("[T]he prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence."). Such conduct is unmistakably improper. "In the capital sentencing context, prosecutors are prohibited from expressing their personal opinion as to the existence of aggravating or mitigating circumstances and the appropriateness of the death penalty. Jurors are mindful that the prosecutor represents the State and are apt to afford undue respect to the prosecutor's personal assessment." *Bates*, 402 F.3d at 644.

Additionally, in the prosecution's rebuttal closing argument, he expressed his personal fear of Beuke, stating that he was "scared to death of that man. I don't want him out on the street again." He then went on to say that for every mistake the criminal justice system has made in sentencing someone to death, he could "bring in five killers on parole, that kill again." This line of argument is grossly improper, as we have held many times before. *See id.* at 648 (finding improper a prosecutor's argument at death penalty hearing warning of future murders if defendant was not put to death). By describing his own personal fear of Beuke and the possibility that he could kill again if not put to death, "the prosecution attempted to place the government's thumb on the scales by repeatedly interjecting personal opinion into the record." *Id.* Such conduct, again, is grossly improper.

Having determined that the prosecution's closing argument at the penalty phase of Beuke's trial was laced with repeated improper statements, it is not difficult to find that the prosecutor's conduct was flagrant, and Beuke was unconstitutionally prejudiced. We analyze the challenged conduct of the prosecutor to determine if Beuke was prejudiced under the following four factors: (1) the likelihood that the prosecution's remarks tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidently made; and (4) the total strength of the evidence against the defendant. *Id.* at 641. And, as in this case, if we are dealing with a death penalty sentencing hearing, this Court must grant relief it if finds that the prosecutor's misconduct "influenced the jury's decision between life and death." *Id.*

First, there can be little doubt that the prosecutor's repeated improper statements mislead the jury and prejudiced Beuke. The prosecution stated that he personally was afraid of Beuke, and implied that there was a real possibility that he would kill again if paroled. Most flagrantly, the prosecution compared Beuke to a cancer that needed to be cut out, and not allowed to remain and

fester.  Just as in *Bates*, "[t]his type of appeal to fear and emotion clearly poisoned the hearing." *Id.* at 648.

Second, as I think is made clear from the discussion above, the prosecution's improper remarks were also extensive.  The prosecution's entire closing argument was "laced . . . with personal opinion, [] and undignified and unprofessional appeals to hatred and fear." *Id.*

The third factor also weighs in Beuke's favor.  The improper remarks were unquestionably deliberate.  Beuke's trial counsel objected multiple times, only to be overruled, and to have the improper conduct continue.  "The intentionality of the prosecutor's improper remarks can be inferred from their strategic use." *Id.*

Finally, I address the total strength of the evidence against Beuke.  It is important to note that we are not addressing the evidence of defendant's guilt — Beuke's conviction for the underlying murder was a foregone conclusion at the penalty phase.  Instead, the inquiry must be focused on the appropriate punishment. *Id.*  Importantly, in the death penalty context, we must distinguish between evidence of the defendant's guilt of the underlying criminal charge and evidence of any attendant aggravating and mitigating circumstances.  "Overwhelming evidence of guilt can often times be sufficient to sustain a conviction despite some prosecutorial misconduct, but overwhelming evidence of guilt does not immunize the sentencing phase evaluation of aggravating and mitigating factors." *Id.* at 648-49.  "[T]he Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).  As we have held before, "[p]rosecutorial misconduct in the sentencing hearing can operate to preclude the jury's proper consideration of mitigation." *Bates*, 402 F.3d at 649 ("When a prosecutor's actions are so egregious that they effectively foreclose the jury's consideration of ... mitigating evidence, the jury is unable to make a fair, individualized determination as required by the Eighth Amendment." (quoting *DePew v. Anderson*, 311 F.3d 742, 748 (6th Cir. 2002) (internal quotation marks omitted)).  It is clear that the extensive and egregious nature of the prosecution's closing argument at the penalty phase precluded the jury's proper consideration of mitigation. *See id.* ("In this capital sentencing context, such flagrant misconduct by the prosecutor cannot be considered harmless error. The prosecutor's unnecessary and intolerable conduct injected such vitriol into the proceedings, as to question the fairness of the entire sentencing hearing.").  It is clear that the prosecution's improper and flagrant conduct "influenced the jury's decision between life and death." *Id.* at 641.

III.

Accordingly, because the prosecution's closing argument unconstitutionally poisoned Beuke's penalty phase hearing, I would reverse the district court and grant Beuke's petition for a writ of habeas corpus.